UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| LEWIS J. LEVINE, D.C., | ) | Violation: |
| | ) | |
| Defendant. | ) | 18 U.S.C. § 1347 (Health Care Fraud) |
| | ) | 18 U.S.C. § 2 (Aiding and Abetting) |
| | ) | |
| | ) | Forfeiture: |
| | ) | |
| | ) | 18 U.S.C. § 982(a)(7) & 21 U.S.C. § 853(p) |

## INFORMATION

The United States Attorney informs the Court that all times relevant:

## COUNT ONE

### (Health Care Fraud)

### The Medicaid Program

1.      Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services ("HHS"). In the District of Columbia, Medicaid ("D.C. Medicaid") was jointly funded by the federal and District of Columbia governments and was administered by the District of Columbia Department of Health Care Finance ("DHCF"). D.C. Medicaid provided health insurance coverage to residents of the District of Columbia whose incomes were below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by D.C. Medicaid were referred to as Medicaid "beneficiaries." D.C. Medicaid was a

"health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

2.      Home care agencies ("HCAs") and nurse staffing agencies ("NSAs") provided home care services, including personal care services, to D.C. Medicaid beneficiaries.  Personal care services were intended to assist beneficiaries in performing the activities of daily living, known as "ADLs."  ADLs were defined to include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

3.      Personal care services were provided by personal care aides ("PCAs"), who were employed by either an HCA, or an NSA that contracted with the HCA, to provide personal care services to D.C. Medicaid beneficiaries.

4.      To be eligible to participate in D.C. Medicaid, HCAs were required to abide by all federal and local laws, regulations, and program manuals governing Medicaid payments.  To receive payments from D.C. Medicaid, HCAs were required to submit claims, electronically or in paper form, to DHCF.  As part of the claims process, an HCA had to identify certain information related to the provision of services including the name of the D.C. Medicaid beneficiary, the dates of service, the type of service provided to the D.C. beneficiary and the corresponding Medicaid billing code for that service, the length of time a service was provided to the beneficiary, and the amount of money being claimed for reimbursement from D.C. Medicaid. Beginning on or about July 2, 2012, the claims also had to include the National Provider Identifier ("NPI") of the physician who had prescribed the personal care services.   D.C. Medicaid only paid for services that were deemed medically reasonable and necessary, and that were provided as claimed.

5.      To receive personal care services covered by D.C. Medicaid, a beneficiary first had to obtain a prescription from a physician (or advanced practice registered nurse).  This prescription was informally known as an "intake."  D.C. Medicaid only reimbursed for personal care services if a physician determined after a physical examination that the beneficiary had functional limitations in one or more ADLs.  The prescribing physician had to have an expectation that the medical, nursing, and social needs of the beneficiary could be adequately and safely met in the beneficiary's home.  Such a determination typically required a medical exam focused on the beneficiary's ability to perform ADLs, as well as questions about the beneficiary's specific living environment and arrangements.  Intakes proposed the frequency and duration of PCA visits.

6.      After being prescribed an intake, the D.C. Medicaid beneficiary was supposed to provide the intake to an HCA.  The HCA then would assign a PCA to the beneficiary and would arrange for a registered nurse to draft a plan of care after performing an initial assessment of the beneficiary's functional status and needs.  The plan of care was required to specify the frequency, duration, and expected outcome of the personal care services, and was supposed to be tailored to address the individual needs of the beneficiary.  The plan of care had to be approved by a physician within 30 days of the start of the provision of personal care services by the PCA to the beneficiary, and had to be re-certified by the physician at least once every six months thereafter.  The plan of care also had to be reviewed by a registered nurse at least once every 62 days, and updated or modified as needed to address the beneficiary's actual medical needs.

7.      A typical intake, translated later into a plan of care, would be for eight hours of personal care services per day for five days per week, or eight hours per day for seven days per week.  In the District of Columbia, over the six-month time span authorized by a single intake

3

and plan of care, D.C. Medicaid could pay approximately $16,952 (eight hours per day with five days per week) or approximately $23,732.80 (eight hours per day with seven days per week) for personal care services provided to one beneficiary.

8.     Intakes and plans of care were only valid if signed by a licensed physician or advanced practice registered nurse, sometimes referred to as a nurse practitioner.

9.     The printed instructions at the top of the intake stated that the "Physician / Nurse Practitioner (NP) is to complete all sections . . . and transmit to home health agency as the order for personal care services." Box 12 of the intake was titled "JUSTIFICATION.  ORDERING PHYSICIAN / NP MUST SPECIFY." Box 13 of the intake – the certification – began with the words "SIGNATURE OF ORDERING PHYSICIAN / NP."

10.     Similarly, the last page of the plan of care had a section titled "Practitioner approving Plan of Care," and the signatory line said "physician/nurse practitioner [advanced practice registered nurse]."

11.     According to the District of Columbia Health Occupations Revisions Act, D.C. Code §§ 3-1201 *et seq.*, individuals licensed as chiropractors are neither physicians nor advanced practice registered nurses or nurse practitioners, and cannot practice medicine.

12.     The top of the intake contained the words, in all capital letters, "DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH CARE FINANCE PRESCRIPTION FORM FOR MEDICAID PERSONAL CARE AIDE SERVICES."

13.     The top of the plan of care contained the words, "Government of the District of Columbia Department of Health Care Finance Division of Long-Term Care," followed by the words, "Plan of Care for Medicaid Personal Care Aide (PCA), Home Health Aide and/or Skilled Nursing Service."

**Defendant and Associated Home Care Agencies**

14.     Defendant LEWIS J. LEVINE, D.C. ("**LEVINE**"), was licensed as a chiropractor in the District of Columbia; at no time was he a physician licensed to practice medicine. **LEVINE** worked at the Anacostia Neck & Back Pain Center, 2041 Martin Luther King Jr. Ave., SE, Washington, D.C.  **LEVINE** was not enrolled as a provider in D.C. Medicaid and D.C. Medicaid did not pay for chiropractic services outside of managed care programs.

15.     American Quality Homecare Services, Inc. ("**AMERICAN QUALITY**"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

16.     Global Healthcare, Inc. ("**GLOBAL**"), a Virginia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

17.     Immaculate Health Care Services, Inc. ("**IMMACULATE**"), a Maryland corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

18.     J. D. Nursing & Management Services, Inc. ("**J.D. NURSING**"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

19.     Nursing Enterprises, Inc., a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

20.     Nursing Unlimited Services, Inc. ("**NURSING UNLIMITED**"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

21.     Ultra International Corp. d/b/a Ultra Home Health Agency ("ULTRA"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

22.     Vizion One, Inc. ("VIZION"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

23.     VMT Home Health Agency, Inc. ("VMT"), a District of Columbia corporation, was licensed as an HCA in the District of Columbia and was enrolled as a provider with D.C. Medicaid.

## The Fraud Scheme

24.     Beginning in or around at least November 2012, the exact date being unknown, and continuing through in or around February 2014, the exact date being unknown, in the District of Columbia, defendant **LEWIS J. LEVINE, D.C.** did knowingly and willfully execute, and attempt to execute, and aided and abetted others in executing and attempting to execute, a scheme and artifice (1) to defraud D.C. Medicaid, a health care benefit program, and (2) to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, D.C. Medicaid, in the connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. §§ 1347 and 2.

## Object and Goal of the Fraud Scheme

25.     It was an object and goal of the scheme and artifice for defendant **LEVINE** to unlawfully enrich himself and to enable others to fraudulently obtain money from Medicaid.

6

## Manner and Means of the Fraud Scheme

The manner and means by which the defendant sought to accomplish the object and goal of the scheme to defraud included, among others, the following:

26.     A PCA approached **LEVINE** in his office and explained that D.C. Medicaid would accept **LEVINE**'s signature for prescribing personal care services even though **LEVINE** was not a physician, was not authorized to prescribe personal care services, and was not enrolled as a provider in D.C. Medicaid.

27.     The PCA further explained that the PCA would bring D.C. Medicaid beneficiaries to **LEVINE**'s office, and **LEVINE** agreed to set aside appointments for the D.C. Medicaid beneficiaries in exchange for cash payments.

28.     **LEVINE** was initially paid $75 for each D.C. Medicaid beneficiary brought to his office by a PCA.  When he realized the volume of D.C. Medicaid beneficiaries being brought to him, **LEVINE** increased the size of the cash payment to $150.

29.     PCAs brought numerous D.C. Medicaid beneficiaries to **LEVINE** for intakes on a weekly and sometimes daily basis.  At first, **LEVINE** accepted the cash payments directly from the D.C. Medicaid beneficiaries, but soon after the scheme began **LEVINE** started accepting cash payments directly from the PCAs who brought the beneficiaries to his office.

30.     When the beneficiaries came to his office, **LEVINE** collected their Medicaid insurance information, including taking a photocopy of their Medicaid insurance card, and noted on the outside of each beneficiary's medical record the following:  "DC Med cash."

31.     In exchange for the cash payments, **LEVINE** agreed to briefly "examine" the D.C. Medicaid beneficiary.   Following the brief examinations, **LEVINE** would typically

prescribe personal care services using the D.C. Medicaid intake, and would sign the certification as the "ordering physician."

32.     LEVINE's intakes would typically include the following diagnoses:  "chronic severe back pain" or similar language, and would typically include a prescription for personal care services for eight hours a day, seven days a week, for six months.  On the intake for at least one D.C. Medicaid beneficiary, LEVINE recorded a diagnosis of "gun shot wound to his left knee," a medical condition that LEVINE was not authorized to treat.

33.     PCAs would take the intakes signed by LEVINE to various HCAs, which would then prepare a plan of care for LEVINE to sign.  Once the HCAs delivered the plan of care to LEVINE, typically via facsimile, LEVINE would sign on the line marked for the "physician" signature, thereby approving the plan of care.

34.     To further enrich himself, LEVINE informed several HCAs for whom he signed plans of care that the D.C. Medicaid beneficiaries had to be re-examined within six months before he would re-certify the plan of care them in six months, but that LEVINE would conduct those "examinations" for an additional payment.

35.     During the course of the fraud scheme, LEVINE signed hundreds of intakes and plans of care, and in exchange collected at least $50,260 in cash payments from D.C. Medicaid beneficiaries and PCAs.

36.     For example, among others, on or about the dates indicated below, LEVINE signed the following intakes and plans of care for the identified D.C. Medicaid beneficiaries:

| Home Care Agency | D.C. Medicaid Beneficiary Initials | Intake Date | Plan of Care Date | Prescribed # Hours / # Days |
|---|---|---|---|---|
| AMERICAN QUALITY | J.G. | 7/17/2013 | 9/4/2013 | 8 hours / 7 days |

| Home Care Agency | D.C. Medicaid Beneficiary Initials | Intake Date | Plan of Care Date | Prescribed # Hours / # Days |
|---|---|---|---|---|
| AMERICAN QUALITY | G.W. | 7/1/2013 | 8/19/2013 | 8 hours / 7 days |
| AMERICAN QUALITY | P.S. | 3/13/2013 | 5/10/2013 | 8 hours / 7 days |
| GLOBAL | A.G. | 9/3/2013 | 9/18/2013 | 8 hours / 7 days |
| GLOBAL | C.T. | 5/6/2013 | 5/10/2013 | 8 hours / 7 days |
| GLOBAL | J.H. | 5/13/2013 | 5/19/2013 12/2/2013 | 8 hours / 7 days |
| IMMACULATE | J.H. | 3/26/2013 8/16/2013 | 3/30/2013 9/17/2013 | 8 hours / 7 days |
| IMMACULATE | T.W. | 10/9/2013 11/11/2013 | 11/21/2013 | 8 hours / 7 days |
| IMMACULATE | W.T. | 11/11/2013 | 11/21/2013 | 8 hours / 7 days |
| JD NURSING | G.C. | 9/3/2013 9/6/2013 | 10/3/2013 | 8 hours / 7 days |
| JD NURSING | M.S. | 8/29/2013 10/16/2013 | 11/12/2013 | 8 hours / 7 days |
| JD NURSING | S.S. | 8/30/2013 | 9/25/2013 | 8 hours / 7 days |
| NURSING ENTERPRISES | J.G. | 8/8/2013 | 10/7/2013 | 8 hours / 7 days |
| NURSING ENTERPRISES | L.T. | 4/30/2013 7/15/2013 | 8/5/2013 9/6/2013 | 8 hours / 7 days |
| NURSING UNLIMITED | J.H. | 1/28/2013 | 1/25/2013 | 8 hours / 7 days |
| NURSING UNLIMITED | R.G. | 3/26/2013 5/31/2013 | n/a | 8 hours / 7 days |
| ULTRA | E.S. | 6/18/2013 7/8/2013 | 6/26/2013 8/16/2013 | 8 hours / 7 days |
| ULTRA | S.S. | 8/12/2013 | 9/5/2013 | 8 hours / 7 days |
| VIZION | B.S. | 8/26/2013 | 9/22/2013 | 8 hours / 7 days |
| VIZION | J.T. | 11/12/12 5/28/2013 | 6/26/2013 12/4/2013 | 8 hours / 7 days |
| VIZION | T.S. | 2/27/2013 3/20/2013 | 4/1/2013 9/25/2013 | 8 hours / 7 days |
| VMT | G.G. | 11/9/12 | 11/20/12 | 8 hours / 7 days |
| VMT | J.T. | 10/11/2013 | 11/5/2013 | 8 hours / 7 days |

37.     **LEVINE** prescribed personal care services to D.C. Medicaid beneficiaries even though he was not legally or medically qualified and could not determine whether the services were medically necessary.

38. **LEVINE** also signed some intakes and plans of care without ever seeing the actual beneficiaries.

39. On other occasions, when HCAs wanted a new intake because the prior one was too old, the HCAs would send LEVINE a new intake, often completely filled out, and **LEVINE** would sign the intake without seeing the beneficiary and then return the signed intake to the HCA.

40. HCAs used the intakes and plans of care signed by **LEVINE** to support and justify their claims for payment to Medicaid for purportedly delivering medically necessary personal care services, even though the intakes and plans of care were invalid on their face because they were not prescribed or signed by a physician as required.

**(Health Care Fraud and Aiding and Abetting, in violation of Title 18,
United States Code, Sections 1347 and 2.)**

## FORFEITURE ALLEGATION

1. Upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. For the offense in Count One, the United States will seek a forfeiture money judgment against the defendant in the amount of at least $50,260.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e.    has been commingled with other property that cannot be divided without

difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the

value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(7) and
Title 21, United States Code, Section 853(p).)**

DATED: August 8, 2014

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

By:

Theodore L. Radway (D.C. Bar No. 473034)
Lionel A. André (D.C. BAR 422534)
Anthony D. Saler (D.C. Bar No. 448254)
Dangkhoa Nguyen (D.C. Bar No. 475917)
Michael Friedman (N.Y. Bar No. 4297461)
Assistant United States Attorneys
Fraud and Public Corruption Section
4th Street, N.W.
Washington, D.C.  20530
Tel:  202.252.7818 (Andre)
Fax:  202.307.2304
Ted.Radway@usdoj.gov
Lionel.Andre@usdoj.gov
Anthony.Saler@usdoj.gov
Michael.Friedman@usdoj.gov
Dangkhoa.Nguyen@usdoj.gov